No. 24-7749

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

COW PALACE, LLC; THE DOLSEN COMPANIES; THREE D PROPERTIES, LLC; GEORGE & MARGARET, L.L.C.; GEORGE DERUYTER AND SON DAIRY, L.L.C.; D AND J DAIRY, L.L.C. (f/k/a D AND A DAIRY, L.L.C.); LIBERTY DAIRY, LLC; ARIZONA ACRES LIMITED PARTNERSHIP; LIBERTY ACRES LLC; BOSMA DAIRY PARTNERS, LLC; BOSMA ENTERPRISES, INC.

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Washington
No. 1:24-cv-3092
Hon. Thomas O. Rice

_____

## APPELLANTS' OPENING BRIEF

_____

Attorneys for Defendants-Appellants:

Devra R. Cohen, WSBA #49952
Lori A. Terry, WSBA #22006
**FOSTER GARVEY PC**

1111 Third Avenue, Suite 3000
Seattle, WA 98101
Telephone: 206.447.4400
Email: lori.terry@foster.com
devra.cohen@foster.com

*Attorneys for Defendants/Appellants George & Margaret, L.L.C.; George DeRuyter and Son Dairy, L.L.C.; and D and J Dairy, L.L.C.*

Meredith R. Weinberg, WSBA No. 45713
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206-359-8000
Facsimile: 206-359-9000
MWeinberg@perkinscoie.com

*Attorney for Defendants/Appellants Liberty Dairy, LLC; Liberty Acres LLC; Bosma Dairy Partners, LLC; Arizona Acres Limited Partnership; and Bosma Enterprises, Inc.*

Jeff B. Kray, WSBA No. 22174
James A. Tupper, Jr., WSBA No. 16873
Bryce M. Brown, OSB No. 225511
**Marten Law LLP**
1191 Second Ave, Suite 2200
Seattle, Washington 98101
jkray@martenlaw.com
jtupper@martenlaw.com
bbrown@martenlaw.com
Ph: (206) 292-2600

*Attorneys for Defendants/Appellants Cow Palace, LLC; The Dolsen Companies; and Three D Properties, LLC*

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................1

II.    JURISDICTIONAL STATEMENT .......................................2

III.   ISSUES PRESENTED FOR REVIEW ................................3

IV.   STATEMENT OF THE CASE ..............................................4

     A.    Statutory and regulatory background ....................................4

     B.    The Dairies' implementation of an EPA-approved consent order and court-approved consent decrees to address nitrate ........................6

     C.    State and local authorities' work to reduce the threat of nitrate contamination and protect access to safe drinking water ...................10

     D.    The geographic scope of the three drinking water programs and extensive groundwater monitoring .......................................12

     E.    Cow Palace's installation of Lagoon 1 under EPA-approved plans ....................................................................15

     F.    EPA's rejection of the Dairies' attempts to resolve EPA's concerns ...............................................................18

     G.    EPA's lawsuit to obtain a preliminary injunction .............................20

     H.    The district court's four-page preliminary injunction order and the local authorities' reactions .............................................21

V.     SUMMARY OF THE ARGUMENT .................................24

VI.    STANDARD OF REVIEW ..................................................27

VII.   ARGUMENT ......................................................................27

     A.    The district court abused its discretion in granting the preliminary injunction for several independent reasons. .........................27

i

1. The district court failed to make specific findings of fact and conclusions of law. ............................................................ 27

2. The district court applied the wrong legal standard. ................. 33

3. The district court erred in finding that EPA met even the lower, incorrect standard for relief. ........................................... 36

 i. The district court erred as a matter of fact and law when it summarily concluded EPA was likely to succeed on the merits of its claim. ................................................................. 36

  a. The district court did not even consider whether "the appropriate State and local authorities have . . . acted" and EPA cannot show that they have not. .................... 37

  b. EPA did not—and cannot—clearly show that there may be an imminent and substantial endangerment within 3.5 miles downgradient of the Dairies. ............. 42

  c. EPA's inaction undercuts its assertion of an imminent and substantial endangerment. ....................................... 46

 ii. The district court erred in finding irreparable harm. ............... 47

 iii. The district court erred in merging the balance-of-equities and public-interest factors. ............................................................ 50

 iv. The district court failed to give serious consideration to the Dairies' equities. .................................................................... 51

 v. The preliminary injunction undermines the public interest. ...... 54

4. The preliminary injunction is impermissibly overbroad. ......... 56

 i. The district court erred as a matter of law in imposing an injunction 3.5 miles downgradient of the Dairies. .................. 56

 ii. The preliminary injunction is not a narrowly-tailored gap filling measure. .......................................................................... 57

ii

B.    The district court abused its discretion by denying the Dairies' motion to strike or in the alternative file a sur-reply ............................ 59

VIII.    CONCLUSION ..................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. For the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...................................................... 34, 51

*Anderson v. United States*,
  612 F.2d 1112 (9th Cir. 1979) ..................................................... 29, 34

*Chamber of Comm. of the U.S. of Am. v. Bonta*,
  62 F4th 473 (9th Cir. 2023) ................................................................51

*Diouf v. Mukasey*,
  542 F.3d 1222 (9th Cir. 2008) ...........................................................28

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ...........................................................50

*El Pollo Loco, Inc. v. Hashim*,
  316 F.3d 1032 (9th Cir. 2003) .............................................................3

*Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*,
  362 F.3d 1204 (9th Cir. 2004) .................................................... passim

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Edu.*,
  82 F.4th 664 (9th Cir. 2023) ...................................................... 25, 34

*Fraihat v. U.S. Immigr. & Custons Enf't*,
  16 F.4th 613 (9th Cir. 2021) ...............................................................57

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ...................................................... passim

*Hansen Beverage Co. v. Vital Pharm., Inc.*,
  No. 08-CV-1545 IEG (POR),
  2008 WL 5427601 (S.D. Cal. Dec. 30, 2008) .....................................35

*Iden v. Stark*,
  No. 3:22-CV-00121-MMD-CLB,
  2022 WL 18231858 (D. Nev. Nov. 3, 2022) .......................................34

*Leister v. Black & Decker (U.S.), Inc.*,
117 F.3d 1414 (4th Cir. July 8, 1997) ............................................................ 25, 43

*Lewis v Gotham Ins. Co.*,
No. 09CV252 L(POR),
2009 WL 3698028 (S.D. Cal. Nov. 5, 2009) .................................................... 26, 59

*Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*,
73 F.4th 657 (9th Cir. 2023) ........................................................................... 23

*Lumbermen's Underwriting Alliance v. Can-Car, Inc.*,
645 F.2d 17 (9th Cir. 1980) ............................................................................ 28, 29

*Mayo v. Lakeland Highlands Canning Co.*,
309 U.S. 310 (1940) ........................................................................................ 28

*Mayview Corp. v. Rodstein*,
480 F.2d 714 (9th Cir. 1973) ........................................................... passim

*Meghrig v. KFC W., Inc.*,
516 U.S. 479 (1996) ........................................................................................ 43

*Meredith v. Oregon*,
321 F.3d 807 (9th Cir. 2003) .......................................................................... 3

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 51

*Overstreet ex rel. N.L.R.B. v. Gunderson Rail Servs., LLC*,
587 F. App'x 379 (9th Cir. 2014) .................................................................... 26, 53

*Paskenta Band of Nomlaki Indians v. Crosby*,
672 F. App'x 762 (9th Cir. 2017) .................................................................... 28, 37

*Peters v. Lincoln Elec. Co.*,
285 F.3d 456 (2d Cir. 2002) ............................................................................ 59

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) ......................................................................... 51

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ........................................................................ 26, 60

v

*RBC Int'l, Ltd. v. Labbeemint, Inc.*,
   No. 1:16-cv-03109-SAB,
   2017 WL 3026931 (E.D. Wash. May 25, 2017)....................................35

*Stanley v. Univ. of S. Cal.*,
   13 F.3d 1313 (9th Cir. 1994) ....................................................... 33, 34

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ................................................... 26, 57

*Tilot Oil, LLC v. BP Prods. N. Am., Inc.*,
   907 F. Supp. 2d 955 (E.D. Wis. 2012) ...................................... 25, 43

*Tovar v. U.S. Postal Serv.*,
   3 F.3d 1271 (9th Cir. 1993) .............................................................60

*Tucson v. City of Seattle*,
   91 F.4th 1318 (9th Cir. 2024) ................................................... 36, 37

*United States v. $133,420.00 in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012) ..........................................................27

*United States v. Price*,
   688 F.2d 204 (3d Cir. 1982) ...........................................................53

*W.R. Grace & Co. v. U.S. E.P.A.*,
   261 F.3d 330 (3d Cir. 2001) ......................................... 36, 37, 38, 43

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...................................................................30, 31, 33

*Yowell v. Abbey*,
   532 F. App'x 708 (9th Cir. 2013).....................................................28

*Zoom Video Commc'ns, Inc. v. RingCentral, Inc.*,
   No. 21-15792,
   2021 WL 4804962 (9th Cir. Oct. 14, 2021) ....................................29

## Statutes

28 U.S.C. § 1292............................................................................2

28 U.S.C. § 1331............................................................................2

vi

28 U.S.C. § 1345 ...................................................................................2

42 U.S.C. § 300 ...................................................................................37

42 U.S.C. § 300g-1 ................................................................ 5, 26, 46, 57

42 U.S.C. § 300i ............................................................................. passim

**Other Authorities**

Advisory Committee Note to Circuit Rule 30-1.1 ....................................8

House Committee Comments on Bill to Assure Public Safe Drinking Water, H.R.
Rep. 93-1185 (1974), *reprinted in* 194 U.S.C.C.A.N. 6454 .......................... 5, 38

**Rules**

Fed. R. App. P. 4 ...................................................................................3

Fed. R. Civ. P. 52 ............................................................................ 24, 27

Fed. R. Civ. P. 65 ............................................................................ 24, 27

**Regulations**

40 C.F.R. § 141.2 ...................................................................................5

40 C.F.R. § 141.51 ....................................................................... 21, 26, 45, 56

40 C.F.R. § 141.62 ....................................................................... 21, 26, 45, 56

## I.   INTRODUCTION

EPA may exercise its emergency powers under the Safe Drinking Water Act (the "Act") only if there "may be an imminent and substantial endangerment to the health of persons" and state and local authorities have not acted.

Neither condition is met in this case. State and local authorities have implemented a program to test drinking water for nitrate and provide safe drinking water to those who need it in the 3.5-mile area downgradient from the Appellant Dairies. The Dairies provide or fund two programs ensuring the Lower Yakima Valley residents in this 3.5-mile area have access to nitrate testing and safe drinking water. Those state and local authorities (and the Dairies) also conduct robust groundwater monitoring for nitrate. Together, their work so far has abated any imminent and substantial threat to public health to which the Dairies operations may have contributed; as a result, nitrate levels in the groundwater do not pose an imminent danger to the public's health. Nevertheless, EPA invoked its emergency power and sought—and obtained—a preliminary injunction requiring the Dairies to create a *new* drinking water program and do *more* groundwater monitoring.

This Court should vacate the preliminary injunction. The district court applied the wrong legal standard and lacks support for its conclusions. Despite this Court's pronouncement that a party seeking a "mandatory" injunction—one requiring a party to act instead of stop acting—faces a "doubly demanding" burden, the district court

1

did not require EPA to show that the facts and law "clearly favor[ed]" EPA. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). But even under the flexible "sliding scale" test, there is no imminent and substantial danger to the residents of the Lower Yakima Valley. And state and local authorities, along with the Dairies, have already negated any potential risk from nitrate contamination. Indeed, the district court did not provide specific facts underlying the "danger" or even mention the state and local authorities' drinking water program and groundwater monitoring. The creation of *yet another* drinking water program will undermine the public interest by confusing and burdening residents who are already leery of water testing and by interrupting pre-existing relationships between the local authorities, the Dairies, and residents. In any event, the injunction is overbroad and violates the Act's plain language, which requires formal rulemaking for the type of change that the court's order imposes.

There was no basis in law or fact for the preliminary injunction. This Court must reverse.

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction over EPA's Safe Drinking Water Act claim for emergency relief, 42 U.S.C. § 300i, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1345. This Court has jurisdiction over the appeal of the preliminary injunction order pursuant to 28 U.S.C. § 1292(a)(1). This Court has pendent appellate

jurisdiction over the district court's denial of the Dairies' motion to strike or in the alternative file a sur-reply. *See, e.g.*, *Meredith v. Oregon*, 321 F.3d 807, 812–13 (9th Cir. 2003) (describing pendent appellate jurisdiction); *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040–41 (9th Cir. 2003) (reviewing district court's denial of motion to strike or file supplemental response brief on review of preliminary injunction).

The district court issued its order granting the preliminary injunction, issuing the injunction, and denying the motion to strike or in the alternative to file a sur-reply on December 17, 2024. 1-ER-3–20. The Dairies timely filed their Notice of Appeal three days later, on December 20, 2024. *See* Fed. R. App. P. 4(a)(1)(B); 6-ER-1188–94.

## III.    ISSUES PRESENTED FOR REVIEW

1.    Whether the district court's order granting the preliminary injunction, which did not set forth findings of fact or address the evidence and arguments that the parties presented, complied with Federal Rules of Civil Procedure 52(a) and 65(d).

2.    Whether the district court erred in granting EPA's motion for a mandatory preliminary injunction without applying the heightened standard for mandatory preliminary injunctions.

3.    Whether the district court erred in granting EPA's motion for a preliminary injunction where EPA is unlikely to succeed on the merits of its Safe

Drinking Water Act claim because state and local authorities and the Dairies are already funding or implementing programs that provide testing and the provision of safe drinking water and monitor groundwater.

4.    Whether the preliminary injunction, which geographically is based on a standard lower than the Maximum Contaminant Level and requires the creation of another, duplicative drinking water program and additional groundwater monitoring, and unnecessary leak testing of Cow Palace Lagoon 1, is legally sound and narrowly tailored.

5.    Whether the district court abused its discretion when it denied the Dairies' motion to strike or in the alternative file a sur-reply, thus denying the Dairies the opportunity to respond to the substantial new evidence EPA put forward in its reply in support of its motion for a preliminary injunction.

## IV.    STATEMENT OF THE CASE

### A.  Statutory and regulatory background

Congress passed the Safe Drinking Water Act in 1974 to protect public health through regulation of the nation's drinking water supply. The Act allows EPA to ask a district court to take "emergency action," but only when EPA can prove all of the following: (1) a contaminant is present in or is likely to enter, (2) an underground source of drinking water, which (3) "may present an imminent and substantial endangerment to the health of persons," and (4) "that appropriate State and local

4

authorities have not acted to protect the health of such persons." 42 U.S.C. § 300i(a). Importantly, as the House Committee evaluating the bill that was eventually passed explained, Congress viewed "the problem of unsafe drinking water as a matter which is and should be primarily the concern of State and local governments." House Committee Comments on Bill to Assure Public Safe Drinking Water, H.R. Rep. 93-1185 (1974), *reprinted in* 194 U.S.C.C.A.N. 6454, 6461. Thus, "[i]n using the words 'that appropriate State or local authorities have not acted to protect the health of persons'" in §300i(a), "the Committee intends to direct the Administrator to refrain from precipitous preemption of effective State or local emergency abatement efforts." H.R. Rep. 93-1185, *reprinted in* 1974 U.S.C.C.A.N. at 6487. If EPA determines State and local efforts are not forthcoming or effective, then EPA may act. *Id.*

Under the Act, EPA may set a Maximum Contaminant Level (MCL) for certain substances in drinking water. EPA may also set a Maximum Contaminant Level Goal (MCLG), a "nonenforceable health goal," that represents "the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, and which allows an adequate margin of safety." 40 C.F.R. § 141.2. The MCL *and* MCLG for nitrate are 10 mg/L and can only be changed by notice and comment rulemaking. 42 U.S.C. § 300g-1(b)(1)(E); 42 U.S.C. § 300g-1(b)(9).

5

## B. The Dairies' implementation of an EPA-approved consent order and court-approved consent decrees to address nitrate

Appellant Dairies[1] conduct (or up until recently conducted) large dairy operations that necessarily produce manure and wastewater, which leads to the creation of nitrate. For many years prior to this lawsuit, the Dairies have been managing their dairy operations pursuant to and consistent with an EPA-approved consent order and court-approved consent decrees related to nitrate. The Dairies have spent *millions* of dollars implementing the consent order and consent decrees. 2-ER-73–124; 4-ER-672; 4-ER-668; 4-ER-665. While there are many other sources of nitrate in the Lower Yakima Valley downgradient of the Dairies, including other large dairies and large agricultural operations, the Dairies have been doing *their* part to manage nitrate from their facilities and ensure residents of the Lower Yakima Valley have safe drinking water. 2-ER-149–52; *see also* 4-ER-734.

***The consent order.*** In March 2013, the Dairies and EPA entered into a negotiated consent order under the Act's emergency provision, § 300i(a), relating to the Dairies' handling of nitrate. 5-ER-1095–1150. Briefly, the consent order requires the Dairies to implement a range of nitrate source control measures, install wells and

---

[1] George DeRuyter and Son Dairy, L.L.C., D and J Dairy, L.L.C., and George & Margaret, L.L.C. ("DeRuyter"); Liberty Dairy, LLC, Liberty Acres LLC, Bosma Dairy Partners, LLC, Arizona Acres Limited Partnership, and Bosma Enterprises, Inc. ("Liberty"); and Cow Palace, LLC, the Dolsen Companies, Three D Properties, LLC ("Cow Palace").

monitor ground water quality, and fund a clean drinking water program for potentially affected residents in a one-mile area downgradient of the Dairies. 2-ER-73. EPA approved the terms of the consent order as being protective of human health, concluding: "EPA has determined that the actions required by this Consent Order are necessary to protect the health of persons who are currently consuming or who may consume or use water from the contaminated portion of the aquifer." 5-ER-1101.

Pursuant to the consent order, the Dairies—through their consultant Anchor QEA—test drinking water and provide reverse osmosis filters (and service of the same) or bottled water to residents whose water tests above the MCL within one-mile downgradient of the Dairies. The Dairies have funded this program since 2013. Since its inception, this program has increased enrollment by 68%. In addition to maintaining enrolled residences' filters—which includes outreach by mail, phone, and/or door-to-door visits to schedule service, as well as the actual service for the treatment systems—the Dairies will re-test wells as requested, and aggressively follow-up with those who requested testing or retesting, including through phone calls and door-to-door visits in English and Spanish. 2-ER-74–89; 2-ER-141–42. The Dairies have continued to try and bring more people into the program. Although not required by the consent order, they engaged in additional outreach to the potentially eligible residences that refused to participate in the program in 2013. That

7

outreach has included mailing postcards (in English and Spanish) notifying residents of their eligibility for a free drinking water treatment system and completion of door-to-door visits to share the same information. 2-ER-84; 2-ER-198–201. Testing, the filters, filter maintenance, and bottled water is entirely free for residents. 2-ER-75–84.

Also pursuant to the consent order, the Dairies have taken substantial source control actions, including consolidating, lining, and abandoning numerous lagoons. The consent order's lining and abandonment requirements are stricter than those in the Washington State Department of Ecology ("Ecology") Concentrated Animal Feeding Operation ("CAFO") Permit's lagoon design requirements. 2-ER-105–06.

The Dairies have also complied with the myriad consent order reporting requirements. Following EPA's highly prescriptive and costly requirements, the Dairies submit monthly progress reports, detailed annual reports, and quarterly groundwater monitoring reports (among others) to EPA. 2-ER-109–15; 2-ER-217–3-ER-493; 3-ER-401–25; 3-ER-529–47; *see also* ECF 59-10–59-18 (draft annual reports).[2] Despite now claiming there is an imminent and substantial endangerment and requesting more groundwater monitoring, EPA has taken little action on

_____

[2] The annual reports are exceptionally detailed and each is many hundreds of pages long. These reports are provided for general context. To avoid overburdening the Court, these reports have not been included in the Excerpts of Record. *See* Advisory Committee Note to Circuit Rule 30-1.1.

materials submitted in the last two years. As of September 30, 2024, when the Dairies submitted their opposition to EPA's motion for a preliminary injunction, 10 draft groundwater monitoring reports (going back to 2022) remained under EPA "review." 2-ER-114–15. Before filing this case, EPA similarly did not invoke the consent order's enforcement provisions or its dispute resolution provision—a measure intended to allow the Dairies and EPA to resolve disputes "expeditiously and informally." 5-ER-1106–10.

*The consent decrees.* In 2015 each Dairy entered into consent decrees originating in a case brought under the Resource Conservation and Recovery Act, 42 U.SC. § 6901, *et seq.* (RCRA). The same district court that issued the preliminary injunction at issue in this appeal approved those consent decrees. 4-ER-672; 4-ER-668; 4-ER-665. The consent decrees imposed additional nitrate-related source control, maintenance, and nutrient management measures, including requiring the Dairies to implement multiple forms of manure treatment to reduce the nitrogen content of manure, more stringent nutrient management measures for the Dairies' application fields, and additional source control measures related to cow pen maintenance, compost area construction and operation, and the inspection and repair of underground manure conveyance. 2-ER-116–24.

In addition, pursuant to the consent decrees, the Dairies fund (but have no control over) the Clean Drinking Water Project, which is overseen by the plaintiff in

the RCRA case and its affiliate. This program provides testing of drinking water and either free water delivery or a reverse osmosis filter system to any residences whose water tests above the nitrate MCL within 1 to 3 miles downgradient of the Dairies. The Dairies have been funding the Clean Drinking Water Project since 2016; it is completely free to residents. 2-ER-116–17; 2-ER-118–20; 5-ER-920–21.[3]

## C. State and local authorities' work to reduce the threat of nitrate contamination and protect access to safe drinking water

The Dairies are not alone in working to protect Valley residents and ensure they have access to safe drinking water. Beginning in 2012 at Yakima County's request, various state and local authorities came together to begin working on the Lower Yakima Valley Groundwater Management Area ("GWMA"). These authorities include Ecology, Yakima Health District, Yakima County, the Washington State Department of Health, the South Yakima Conservation District, and the Washington State Department of Agriculture. 4-ER-703–730. Ecology approved the GWMA's program in 2019, finding that it "provides a technically sound set of best management practices, education and outreach efforts, technology based actions, and inter-agency coordination initiatives. Implementation of these

---

[3] The Dairies are subject to a third layer of regulations that protect surface and groundwater quality. The DeRuyter and Cow Palace Dairies are covered by Ecology's CAFO Permit. Liberty also has applied for permit coverage. 2-ER-146; *see also* 4-ER-696.

tools and actions will begin addressing the reduction of nitrate in groundwater within the Lower Yakima Valley Groundwater Management Area." 4-ER-698.

The state and local authority GWMA partners are implementing dozens of actions to reduce the threat of nitrate contamination—from public education and outreach, to developing and piloting innovative farm techniques, to encouraging extending municipal sewer and public water system. 4-ER-711–15. Most relevant here, state and local authorities have partnered to form the GWMA Safe Drinking Water Initiative. Similar to the other programs operating in the Valley, through the Safe Drinking Water Initiative, state and local authorities provide outreach, free nitrate testing for drinking water, and where a residence tests above the nitrate MCL, free bottled water or a reverse osmosis filter. This program—like the others—is free to residents; it is supported by state funding. 5-ER-926–39; 4-ER-656–57; 2-ER-124–126.

In addition, state and local authorities conduct nitrate monitoring through the Ambient Groundwater Monitoring Network. This 170-well network includes both groundwater and drinking water wells. 2-ER-127–28; 2-ER-215; 4-ER-816–55; 4-ER-823; *see generally* 4-ER-762–814.

Both the Safe Drinking Water Initiative and the Ambient Groundwater Monitoring Network operate in and extend well beyond the 3.5 miles covered by the preliminary injunction. 4-ER-823; 2-ER-126–27.

11

### D. The geographic scope of the three drinking water programs and extensive groundwater monitoring

Within the approximately 3.5 miles downgradient of the Dairies covered by the preliminary injunction there are already *three* programs that test drinking water for nitrate and, where there is an exceedance of the 10 mg/L MCL, provide the residence with safe drinking water: The program the Dairies administer pursuant to the consent order; the program the Dairies fund under the consent decrees; and the state and local authorities' Safe Drinking Water Initiative. 2-ER-126–27; 2-ER-141–43. A household that is within 1-mile downgradient of the Dairies whose nitrate levels exceed the MCL may enroll in the consent order program or opt to receive services directly from the County. 2-ER-126.

As the following map shows, these overlapping programs cover the entire area within the preliminary injunction boundaries. The Dairies are represented by the gray cross-hatched areas, and the Safe Drinking Water Initiative operates within the green GWMA boundary, which extends around and far beyond 3.5 miles downgradient of the Dairies:



3-ER-572; *see also* 2-ER-125–26; 2-ER-141–43.

In addition to drinking water programs, EPA has access to data from a robust nitrate monitoring network. This includes access to data collected from the state and local authorities 170-well Ambient Groundwater Monitoring Network. 2-ER-127. The following map shows this network of wells; the green arrow and text box, added by the Dairies, demonstrates that many of these wells are downgradient from the Dairies.

13



4-ER-823 (arrow and text box added); *see also* 2-ER-215 (map showing the Dairies and GWMA's monitoring locations with preliminary injunction boundary).

In addition, the Dairies conduct groundwater monitoring as required by the consent order and consent decrees. This monitoring network encompasses 40 wells, all of which are monitored for nitrate. 2-ER-89–90; 2-ER-97–98; 2-ER-120–21; 2-ER-215. The Dairies have been monitoring and reporting the data back to EPA since 2013 (for the consent order wells) and 2017 (for the consent decree wells). 2-

14

ER-89–99; 2-ER-109; 2-ER-116; 2-ER-120–22; *see also, e.g.*, 2-ER-217–3-ER-493 (quarterly groundwater monitoring report).

### E. Cow Palace's installation of Lagoon 1 under EPA-approved plans

As noted above, the consent order and consent decrees included requirements for various source control measures, including lining of lagoons. Cow Palace Lagoon 1 ("Lagoon 1") was properly installed according to both the manufacturer specifications and the specific plans approved by EPA. 3-ER-593–94.

The Lagoon 1 liner was installed by Hilmes Construction, Inc., and its subcontractor Northwest Linings and Geotextile Products, Inc. 4-ER-651. Anchor QEA provided general construction oversight and construction quality assurance and Peak GeoSolutions, a subcontractor, provided specific quality assurance for compaction testing, subgrade compliance, and geosynthetic liner installation. These four third-party contractors ensured that Lagoon 1 was lined in accordance with the approved Lagoon Work Plan. 3-ER-593–94.

On or about November 28, 2019, high winds caused failures on three panel seams and a tear near the center of the secondary liner. The secondary liner was repaired rather than replaced in accordance with the QA/QC procedures. 4-ER-626–27; *see* 5-ER-1156. The repair work took place between November 29 and December 6, 2019. During the repair process, Peak GeoSolutions verified that welding surfaces were cleaned and free of moisture, dust, dirt, and debris prior to

15

and throughout the welding process. While the QA/QC manual states that "damaged and rejected panels (or portions) shall be marked, removed from the work area, and the removal recorded/documented," 5-ER-1153, the word "damage" as used in the text of the Completion Report, *see* 5-ER-1160, did not amount to "damaged and rejected panels" requiring removal. All repaired seams were re-tested with a vacuum box and passed the re-testing procedure as logged in Appendix A to the Completion Report. 4-ER-627; 4-ER-630–41; 5-ER-1155; 5-ER-1157. The repaired liner was re-examined, re-inspected, and cleared by Peak GeoSolutions on December 6, 2019. *See* 5-ER-1154–55; 5-ER-1157. These repair welds were completed using approved procedures which are the same procedures to weld the liner panels together during installation, i.e., there is no difference between the repair welds and the initial welds completed during installation.

While filling Lagoon 1 in February 2020, a leak was detected and the sump pump automatically returned leachate to the lagoon. The leak detection system worked exactly as intended. 4-ER-627. The rate of leachate recovery and pump out was approximately 1 gallon per minute. 4-ER-623. In the spring, when Cow Palace was able to lower the Lagoon 1 level, it did so and checked for leaks in the primary liner. Several small leaks near the sump were discovered and repaired on May 5, 2020. 4-ER-627.

16

Since the completion of the repairs to the primary liner, Cow Palace has continued to monitor the Lagoon 1 leak detection system on a monthly basis. Leachate has not accumulated in the sump, and the sump pump has not been activated, indicating that there is no longer a leak in the primary liner. 4-ER-662; 4-ER-628.

Additionally, the levels of nitrate in monitoring well DC-14, increasing from late-2019 to mid-2022 and decreasing from late-2022 to present, represent a classic example of the effects from a one-time effect and not an ongoing release that would be associated with leaks in both the primary and secondary liners. 3-ER-579; 3-ER-602–03.

Cow Palace attempted to resolve EPA's concerns that Lagoon 1 was leaking by providing ample evidence and meeting with EPA to discuss the potential leak and additional monitoring to assess other potential sources of the spike in DC-14. 3-ER-598–99. These discussions culminated in a meeting between Cow Palace and EPA on April 27, 2023. The meeting was summarized in an email from Cow Palace's consultant, Eric Weber, to EPA dated May 16, 2023. Cow Palace ultimately agreed not to install an additional monitoring well near DC-14 due to EPA's skepticism concerning its value. Cow Palace proposed an additional year of monitoring to evaluate the cause of elevated concentrations and suggested revisiting leak testing and additional monitoring wells at that time. Cow Palace also invited

EPA to conduct a site-visit to review Lagoon 1 operations and site operations in general. EPA did not respond to Cow Palace's invitation and did not discuss Lagoon 1 with Cow Palace again before filing this lawsuit. 3-ER-599.

### F.  EPA's rejection of the Dairies' attempts to resolve EPA's concerns

The Dairies' ongoing commitment to the health of the Lower Yakima Valley is exemplified by its actions related to groundwater monitoring. The consent order's 8-year groundwater monitoring provisions expired in 2021. Nonetheless, the Dairies continue to voluntarily monitor the consent order wells, along with monitoring the required consent decree wells. 2-ER-96–99; 2-ER-120–22.

The Dairies continue this voluntary monitoring despite EPA being unwilling to work with them to reach an agreement on continued monitoring under the consent order. For months after EPA reached out in September 2021 expressing a desire for continued groundwater monitoring under the consent order, the Dairies provided numerous proposals that would keep only those aspects of the monitoring program that continued to provide *useful* information, and eliminate those that no longer served a purpose but were very costly. EPA, however, refused to meaningfully engage, instead repeatedly insisting the Dairies continue with *all* of the expired monitoring requirements of the consent order, and rejecting the Dairies numerous requests for dispute resolution under the consent order. The Dairies tried one final time in June 2022 to invoke dispute resolution. EPA refused both dispute resolution

and further negotiation. 4-ER-857–5-ER-918; 4-ER-685; 3-ER-591–92. Two years later, without warning, it filed suit. 4-ER-685.

Nonetheless, the Dairies have voluntarily continued to monitor the same wells they did before the consent order's groundwater monitoring requirement expired and dutifully report the results back to EPA. 2-ER-96–99; 2-ER-217–3-ER-493. The Dairies' monitoring data shows that in a number of wells, there is a *decreasing* nitrate trend. 2-ER-121–22; 2-ER-129–34; 3-ER-495–99; 5-ER-975–76; 5-ER-1006–18.

A recent event demonstrates that the existing groundwater monitoring provides the necessary information to track nitrate. That voluntary monitoring allowed the Dairies to identify—and respond promptly to—a recent aberrant spike in nitrate at one of the wells. In response to that spike, Anchor QEA identified the likely source—a control structure used to contain off-site irrigation water, which has since been removed from service—and initiated (and is continuing) follow-up testing of drinking water at homes of nearby residents to ensure that all residents have safe drinking water. 2-ER-122–24; 3-ER-531; 4-ER-549–70.

The existing monitoring conducted by the Dairies and the state and local authorities provides EPA with ample information to accurately track nitrate and respond to any emerging concerns.

### G. EPA's lawsuit to obtain a preliminary injunction

Despite the 11 years of work the Dairies have done to address nitrate, the multiple overlapping drinking water programs, the extensive groundwater monitoring, and the active role state and local authorities are taking to ensure Lower Yakima Valley residents have access to safe drinking water, on June 26, 2024, EPA filed a complaint against the Dairies under the Act without even calling the Dairies beforehand. *See* ECF No. 1.

EPA then moved for a preliminary injunction, asking the district court to require the Dairies to implement and pay for a *new* drinking water program, do additional groundwater monitoring, and order a leak test for Cow Palace. But this case is the *first time* since the Dairies signed the consent order in 2013 that EPA has *ever* suggested they are not doing enough under either the consent order or the consent decrees to provide drinking water testing and alternative water supplies to residents in the 3.5-mile area of the preliminary injunction. 2-ER-85–86.

In arguing for the preliminary injunction, EPA relied primarily on the groundwater modeling of its expert. Among other inputs, EPA's expert assumed that source area groundwater nitrate concentrations increased in the late 1990s and have remained constant over the last 10 years of his model calculations (2013 to 2022). 5-ER-974. He also assumed uniform groundwater velocity and no aquifer recharge from drains and canals. Further, EPA relied on a 1 mg/L nitrate standard—an order

20

of magnitude lower than the MCL/MCLG—to draw the boundary of the area where it asked the Court to order injunctive relief. 5-ER-964–75; 5-ER-976–78.

The Dairies vigorously opposed the motion, pointing out significant deficiencies in EPA's arguments and evidence; for instance, relying on their own expert to show that the data demonstrates a *decrease* in nitrate trends at numerous wells over the last 10 years, evidencing a relatively rapid response in groundwater quality to the source control actions undertaken by the Dairies. 5-ER-975–76; 5-ER-1006–08. The Dairies also showed the district court why EPA's model is overly simplistic and used bad assumptions that resulted in an inaccurate representation of groundwater flow and nitrate transport. 5-ER-965; 5-ER-973–76; 2-ER-121–22; 2-ER-129–35; 3-ER-495–99; 3-ER-610–11. The Dairies also pointed out that the nitrate MCL and MCLG are 10 mg/L—not less than 10 mg/L, as EPA advocated for the court to use in deciding the scope of the injunction. 40 C.F.R. § 141.62(b)(7); 40 C.F.R. § 141.51(b); *see also* 5-ER-1063–65.

EPA then submitted 12 declarations with its reply. The Dairies promptly moved to strike the improper evidence or in the alternative for a sur-reply.

## H. The district court's four-page preliminary injunction order and the local authorities' reactions

On December 17, 2024, the district court issued a four-page opinion granting EPA's motion for a preliminary injunction and denying the Dairies' motion to strike or in the alternative for a sur-reply. The court applied the standard for a prohibitory

injunction but did not mention the heightened standard applicable to mandatory injunctions, like the one EPA sought. The court did not acknowledge or address all of the elements of EPA's claim. Nor did it discuss the evidence before it on each of the preliminary injunction factors. *See generally* 1-ER-4–7. Instead, in addressing the preliminary injunction factors the court concluded that "nitrates are an extreme danger to the public's health that draws their water from contaminated wells," and "failure to grant injunctive relief would have a significant impact on the public's health." 1-ER-5–7. It then adopted wholesale the 13-page preliminary injunction that EPA proposed. *Compare* 1-ER-8–20, *with* 5-ER-1170–84.

The injunction requires the Dairies to immediately commence outreach and testing of residential wells; within 30 days (i.e., by January 16, 2025) develop and submit to EPA for approval a Quality Assurance Project Plan ("Plan") for well testing and outreach; identify and retain two or more independent, third-party organizations—who must collectively have particularized "demonstrated experience" in public health outreach in the Lower Yakima Valley and have sufficient personnel to accomplish the work required by the preliminary injunction—to coordinate and interact with residents regarding drinking water; engage in new and significant well-testing and follow-up activities, all with prescriptive time requirements; within 30 days develop and submit to EPA for approval a plan for groundwater monitoring; conduct quarterly groundwater monitoring; within 21 days

(i.e., by January 7, 2025) Cow Palace had to submit a plan for EPA approval to test the Lagoon 1 liners for leaks; and implement numerous requirements related to testing for Cow Palace Lagoon 1. 1-ER-8–20.

Shortly after the district court issued the preliminary injunction, the Board of Yakima County Commissioners issued a media release stating: "[T]he EPA, using the DOJ, has very unnecessarily caused alarm within our community and threatens the confidence that our residents have in the strong, existing collaborative efforts between Yakima County, the Yakima Health District, the State Department of Health and the State Department of Ecology." Board of Yakima County Commissioners, *Media Release: Yakima County Reassures Residents Regarding Efforts to Ensure Safe Drinking Water in the Lower Yakima Valley* (Dec. 23, 2024), (quoting Commissioner Amanda McKinney).[4]

---

[4] The Dairies respectfully request that the Court take judicial notice of this media release. Commissioner McKinny verified in a declaration to this Court that this release was true and correct and "was issued on behalf of all three members of the Yakima County Board of Commissioners expressing concerns with the new drinking water program ordered by the court." Dkt. 20.1 at 193 ¶ 3; *see id.* at 192–96; *Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 677 (9th Cir. 2023) (taking judicial notice of an FDA press release). The media release is also publicly available at https://bloximages.newyork1.vip.townnews.com/yakimaherald.com/content/tncms/assets/v3/editorial/8/da/8da864ea-c4b5-11ef-abce-fbc3fade0ed6/676f4b079f563.pdf.pdf.

Three days after the court issued the injunction, on December 20, 2024, the Dairies filed their notice of appeal and an expedited motion to stay the preliminary injunction pending appeal at the district court. ECF 84–86. After the district court denied that motion (in another three-page order), ECF 90, the Dairies filed an emergency motion to stay at this Court. This Court denied that motion in a one-sentence order citing *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## V.   SUMMARY OF THE ARGUMENT

The district court's cursory order granting the EPA a sweeping mandatory preliminary injunction should be vacated and reversed for several, independent reasons.

**First**, the district court's order granting the injunction failed to include the findings of fact required by Federal Rules of Civil Procedure 52 and 65. Rather than provide sufficient explanation to allow this Court to understand the reasons and bases for its decision or engage in any discussion of the evidence before it, the district court's opinion includes fewer than 10 sentences of analysis. Even those are limited to repeating EPA's contentions and a conclusory statement in EPA's favor. This does not meet the requirements of the Civil Rules. *See* Fed. R. Civ. P. 52, 65; *Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1219 (9th Cir. 2004); *Mayview Corp. v. Rodstein*, 480 F.2d 714, 718 (9th Cir. 1973).

**Second**, the district court applied the incorrect legal standard in evaluating EPA's request for a mandatory preliminary injunction. It did not hold EPA to the heightened "clearly favors" standard of mandatory preliminary injunctions. *Garcia*, 786 F.3d at 740–42. Instead, it erroneously evaluated EPA's request under the lesser standard used for prohibitory injunctions. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Edu.*, 82 F.4th 664, 683–84 (9th Cir. 2023).

**Third**, the district court erred as a matter of law and fact in concluding that EPA met its burden entitling it to a preliminary injunction. EPA was required to clearly show that there may be an imminent and substantial endangerment to the public and that state and local authorities are not acting to protect the public. 42 U.S.C. § 300i(a). Not only did the district court fail to address whether state and local authorities were acting sufficiently, a failure that in itself is dispositive, *Mayview Corp.*, 480 F.2d at 717, but EPA did not clearly show that they are not. Nor could it, as the ongoing efforts of the state and local authorities combined with those of the Dairies protect Lower Yakima Valley residents' access to safe drinking water and negate any potential threat from nitrate contamination. *Leister v. Black & Decker (U.S.), Inc.*, 117 F.3d 1414, 1997 WL 378046, at *1, *3 (4th Cir. July 8, 1997) (unpublished); *Tilot Oil, LLC v. BP Prods. N. Am., Inc.*, 907 F. Supp. 2d 955, 968 (E.D. Wis. 2012). The district court further erred by failing to give careful

25

consideration to all of the *Winter* factors. *Overstreet ex rel. N.L.R.B. v. Gunderson Rail Servs., LLC*, 587 F. App'x 379, 381–82 (9th Cir. 2014).

**Fourth**, the preliminary injunction is legally unsound and overbroad. Its geographic scope is premised on a nitrate concentration standard *below* the enforceable MCL and health-protective MCLG. 40 C.F.R. § 141.62(b)(7); 40 C.F.R. § 141.51(b). These standards cannot be changed through litigation, which is what the district court effectively did through the preliminary injunction. 42 U.S.C. § 300g-1(b)(1)(E); 42 U.S.C. § 300g-1(b)(9). Moreover, the injunction is not a gap-filling measure. Instead, it requires the creation of yet another drinking water program, more unnecessary groundwater monitoring, and an unnecessary leak test. This overbroad preliminary injunction was an abuse of discretion. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).

This Court should also reverse the district court's denial of the Dairies' motion to strike or in the alternative file a sur-reply. EPA improperly submitted substantial evidence on reply that either should have been submitted with its opening brief or was irrelevant to the matters at hand. By denying the Dairies' motion to strike—and not granting them an opportunity to respond to the new evidence—the district court abused its discretion and allowed litigation by ambush. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *Lewis v Gotham Ins. Co.*, No. 09CV252 L(POR), 2009 WL 3698028, at *1 (S.D. Cal. Nov. 5, 2009).

## VI.    STANDARD OF REVIEW

This Court "review[s] de novo the legal premises underlying a preliminary injunction," and otherwise "review[s] for abuse of discretion the district court's grant of a preliminary injunction." *Enforma*, 362 F.3d at 1211–12.

This Court reviews denial of a motion to strike or for leave to file a sur-reply for abuse of discretion. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 337 (9th Cir. 2012).

## VII.    ARGUMENT

### A. The district court abused its discretion in granting the preliminary injunction for several independent reasons.

#### 1. The district court failed to make specific findings of fact and conclusions of law.

District courts must support an order granting a preliminary injunction with findings of fact and conclusions of law. Fed. R. Civ. P. 52(a) (a district court that grants a preliminary injunction "must find the facts specifically and state its conclusions of law separately"); Fed. R. Civ. P. 65(d)(1)(A) ("[e]very order granting an injunction . . . must . . . state the reasons why it issued"). Despite the Supreme Court's pronouncement that "[i]t is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with Rule 52(a)," here, the district court's opinion does not provide this Court with any findings by which it can determine the basis for the

27

district court's decision. *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316 (1940); *Diouf v. Mukasey*, 542 F.3d 1222, 1235 n.7 (9th Cir. 2008) (noting "the district court failed to support its original preliminary injunction with findings of fact and conclusions of law, *as it was required to do*" (emphasis added)). These findings must be sufficiently comprehensive to afford this Court "a clear understanding of the basis of decision of the district court." *Lumbermen's Underwriting Alliance v. Can-Car, Inc.*, 645 F.2d 17, 18 (9th Cir. 1980) (quoting *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975)).

This Court reverses injunctions where the district court's order does not provide adequate findings or an explanation of its reasons for granting the injunction. *See, e.g.*, *Paskenta Band of Nomlaki Indians v. Crosby*, 672 F. App'x 762, 763 (9th Cir. 2017) (vacating preliminary injunction "[b]ecause the district court order in this case does not meet this standard" of putting forth findings of fact and conclusions sufficient to enable meaningful appellate review); *Yowell v. Abbey*, 532 F. App'x 708, 710 (9th Cir. 2013) (vacating injunction where "[t]he district court failed to make the findings of fact and conclusions of law required by Federal Rules of Civil Procedure 52(a)(1)-(2) and 65, without which we cannot discern the basis for the court's decision."); *Enforma*, 362 F.3d at 1219 (vacating preliminary injunction because of deficiencies in district court's findings where there was competing evidence); *Mayview Corp.*, 480 F.2d at 718 (reversing injunction where "the district

28

court made no findings of any kind" as to a key element of plaintiff's patent claim or any facts that could form the basis of preliminary injunction against trademark infringement); *cf. Lumbermen's Underwriting Alliance*, 645 F.2d at 18–19 (vacating judgment, explaining the "conclusory findings," which "consist[ed] solely of two brief statements," "do not meet the standards" of Rule 52(a)).

These findings are particularly important where, as here, there are significant factual disputes and EPA is seeking a mandatory preliminary injunction. A court need not "decide doubtful and difficult questions of law or disputed questions of fact" on a motion for preliminary injunction. *Zoom Video Commc'ns, Inc. v. RingCentral, Inc.*, No. 21-15792, 2021 WL 4804962, at *1 (9th Cir. Oct. 14, 2021) (quoting *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986)) (affirming denial of preliminary injunction). If it *does* decide disputed facts, the court must clearly set forth *why* it rejected one side's evidence in favor of the other. *Enforma*, 362 F.3d at 1216–17. For mandatory preliminary injunctions—which require the parties to take affirmative action, rather than simply maintain the status quo—the findings must be sufficient to show that the "the facts and law *clearly favor* the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) (emphasis added) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)); *see also, e.g.*, *Garcia*, 786 F.3d at 740 (same).

29

Here, the opinion does little more than recite the legal standard for each *Winter*[5] factor and then issue a summary concluding sentence or two in favor of EPA. This does not meet the requirements of the Federal Rules.

With regard to the first *Winter* factor—EPA's likelihood on success of the merits, 555 U.S. at 20—the district court's entire discussion is limited to two sentences. The first simply repeats the legal standard: "To obtain injunctive relief, Plaintiff must show that there are 'serious questions going to the merits' of its claim, and that it is likely to succeed on those questions of merit." 1-ER-5 (quoting *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *Farris v. Seabrook*, 677 F.3d 858, 865 (9th Cir. 2012)). The second sentence is nothing more than a cursory conclusion: "Plaintiff has come forward with sufficient evidence that the nitrates are an extreme danger to the public's health that draws their water from contaminated wells." 1-ER-5–6. This conclusion is devoid of any discussion of the Dairies' competing evidence, detailed below, which demonstrated that EPA cannot show there is an imminent and substantial endangerment. Moreover, the Court did not identify—let alone analyze—whether the state and local authorities have acted to protect the health of persons, an essential element of EPA's claim. 42 U.S.C. § 300i(a).

---

[5] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

30

The district court's analysis of the other *Winter* factors was similarly lacking. With regard to irreparable injury, *Winter*, 555 U.S. at 22, the court simply repeated EPA's contention, set forth the generic legal standard, and summarily concluded, "Plaintiff has a duty to protect the health and well-being of its residents that are being affected by the high levels of nitrate. This injury is irreparable absent a preliminary injunction." 1-ER-6. With regard to the balance of equities and public interest, *Winter*, 555 U.S. at 24, the court combined its analysis of these two elements, set out the legal standard, and then concluded: "More importantly, though, failure to grant injunctive relief would have a significant impact on the public's health. The public interest weighs heavily in favor of granting preliminary injunctive relief." 1-ER-6– 7. At no point did the district court recognize, or evaluate, the evidence the Dairies put forward that showed the public has access to multiple protective drinking water programs. The district court similarly ignored the Dairies' evidence demonstrating that the Dairies and the state and local authorities are also monitoring groundwater and that numerous groundwater wells show a downward trend in nitrate. And the court did not address—much less consider—the Dairies' arguments and evidence showing that the equities tipped in their favor. *See infra*, Part VII.3.iv; 5-ER-1069– 72. The district court's conclusory statements are not nearly enough. *See, e.g.*, *Enforma*, 362 F.3d at 1215–16.

31

The district court's order is similar to those that this Court vacated in *Enforma Natural Products, Inc.* and *Mayview Corp.* In *Enforma*, this Court concluded that the district court's findings were not "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision," because this Court could not determine *why* the district court rejected Enforma's evidence and "[t]he record reveal[ed] genuine disputes" as to why the court may have rejected Enforma's evidence. 362 F.3d at 1216–17 (quoting *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1444 (9th Cir. 1985)). While the Court recognized that there was a "strong possibility that any one of the district court's possible reasons for rejecting Enforma's evidence would pass 'clear error' review," it determined it "need not engage in speculation." *Id.* at 1217. Instead, it vacated the injunction and remanded to the district court. *Id.* at 1219.

Similarly, in *Mayview Corp.*, this Court reversed a preliminary injunction where the district court did not make findings on essential elements of the claim, and "did not and perhaps could not make specific findings which might have resolved the many disputed factual issues herein." 480 F.2d at 717, 719. This Court continued, "[s]o far as we can tell in the absence of such findings, no injunction would have been warranted because of [plaintiff's] failure to establish that he was clearly entitled to it." *Id.* at 719.

32

As in *Enforma* and *Mayview Corp.*, the district court did not—and perhaps could not—support its ultimate decision with clear findings resolving the many issues that EPA and the Dairies raised in their briefing and supporting declarations. As it did in *Enforma* and *Mayview Corp.*, this Court should reverse the order granting the preliminary injunction because the district court failed to provide the required findings and analysis.

### 2. The district court applied the wrong legal standard.

"The grant of a preliminary injunction is the exercise of very far reaching power never to be indulged in except in a case clearly warranting it." *Mayview Corp.*, 480 F.2d at 719 (quoting *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)). To obtain a prohibitory preliminary injunction, EPA had to demonstrate that it is (1) likely to succeed on the merits, (2) is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) that the balance of equities tips in EPA's favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Because EPA is seeking a mandatory injunction—a "particularly disfavored" form of relief, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)—it faces "doubly demanding [burden]: Because [plaintiff] seeks a mandatory injunction, [it] must establish that the law and facts *clearly favor* [its] position, not

33

simply that she is likely to succeed," *Garcia*, 786 F.3d at 740; *see also, e.g.*, *Stanley*, 13 F.3d at 1320; *Anderson*, 612 F.2d at 1114.

Using the "sliding scale" "serious questions" variation of *Winter*, where plaintiff must demonstrate that there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff," along with showing "a likelihood of irreparable injury and that the injunction is in the public interest," *Cottrell*, 632 F.3d at 1135, would be inconsistent with the heightened burden plaintiff faces when seeking a mandatory preliminary injunction. *See Fellowship of Christian Athletes*, 82 F.4th at 684 (recognizing the "serious questions" variation is "a lesser showing than likelihood of success"); *Iden v. Stark*, No. 3:22-CV-00121-MMD-CLB, 2022 WL 18231858, at *2–3 (D. Nev. Nov. 3, 2022) (explaining the standard for mandatory preliminary injunctions is "even more stringent" than either the classic *Winter* test or the "sliding-scale" test), *report and recommendation adopted by* No. 3:22-cv-00121-MMD-CLB, 2023 WL 158670, at *1 (D. Nev. Jan. 11, 2023).

The district court did not acknowledge that EPA was seeking a mandatory preliminary injunction. It neither cited this heightened standard, nor applied it. *See* 1-ER-5. This was error. *See Fellowship of Christian Athletes*, 82 F.4th at 683–85 (holding district court "erred in applying a heightened standard applicable to mandatory injunctions" where plaintiffs sought a prohibitory injunction).

This error was particularly problematic because there are significant disputes of material fact in this case. The parties collectively submitted 25 declarations with voluminous exhibits, in support of, and in opposition to, EPA's motion for preliminary injunction. *See generally* ECF Nos. 14–16, 50–59, 64–75. Because there are significant factual disputes, the facts and law *cannot* "clearly" favor EPA and the court should not have granted the injunction. *Garcia*, 786 F.3d at 744 (affirming denial of mandatory preliminary injunction, explaining "[i]ssuance of the mandatory preliminary injunction requires more than a mere possible or fairly debatable claim; it requires a showing that the law 'clearly favor[s]'" plaintiff (quoting *Stanley*, 13 F.3d at 1320)); *RBC Int'l, Ltd. v. Labbeemint, Inc.*, No. 1:16-cv-03109-SAB, 2017 WL 3026931, at *7 (E.D. Wash. May 25, 2017) (declining to issue preliminary injunction where there were questions of material fact, explaining "the Court cannot say that the facts and the law 'clearly favor'" plaintiff); *Hansen Beverage Co. v. Vital Pharm., Inc.*, No. 08-CV-1545 IEG (POR), 2008 WL 5427601, at *4 (S.D. Cal. Dec. 30, 2008) (declining to issue preliminary injunction where there were significant factual disputes).

The district court abused its discretion because it rested its analysis on an erroneous legal standard: It held EPA to the lower standard of a prohibitory injunction, rather than the heightened standard appropriate for mandatory preliminary injunctions. *See Tucson v. City of Seattle*, 91 F.4th 1318, 1324 (9th Cir.

2024) (explaining when a district court's decision is based on an erroneous legal standard). This Court should reverse on this basis as well.

### 3. The district court erred in finding that EPA met even the lower, incorrect standard for relief.

Even if the Court determines that the district court's bare conclusory statements are sufficient under Rules 52(a) and 65(d)—they are not—and that the court applied the correct legal standard—it did not—it should still reverse the order granting the preliminary injunction because the district court erred as a matter of law and fact.

#### i. The district court erred as a matter of fact and law when it summarily concluded EPA was likely to succeed on the merits of its claim.

As described above, "emergency power [under the Act] is not without limitation." *W.R. Grace & Co. v. U.S. E.P.A.*, 261 F.3d 330, 339 (3d Cir. 2001). For purposes of this appeal only, the Dairies do not dispute the first two elements that EPA must prove: that nitrate is a contaminant in an underground source of drinking water in parts of the Lower Yakima Valley. But EPA did not, and cannot, clearly show the third and fourth elements of its claim—that nitrate may present an imminent and substantial endangerment and that appropriate state and local authorities have not acted. *See* 42 U.S.C. § 300i(a). The district court erred in concluding that EPA was likely to succeed on the merits of its claim.

36

a. **The district court did not even consider whether "the appropriate State and local authorities have . . . acted" and EPA cannot show that they have not.**

"EPA is *only* authorized [to act under § 300i(a)] when state and local authorities have *not* acted first." *W.R. Grace*, 261 F.3d at 339 (emphasis added); *see also* 42 U.S.C. § 300i(a). The district court's analysis of EPA's likelihood of success on the merits ignored this essential element of EPA's claim, instead only concluding that there was a danger to the health of the public who draw their water from contaminated wells. *See* 1-ER-5–6. But endangerment, even if it existed (and as discussed below, it does not), is not enough. To succeed on its claim, EPA *also* had to clearly show that the state and local authorities were not acting to protect the health of the public. 42 U.S.C. § 300i(a).

The district court's misapprehension of the law is legal error—and its concomitant lack of findings on whether the state and local authorities were acting to protect the public—is dispositive of this appeal. This Court must reverse. *Mayview Corp.*, 480 F.2d at 717; *see also Paskenta Band of Nomlaki Indians*, 672 F. App'x at 763 (vacating preliminary injunction and explaining that on remand, "[i]n assessing whether the Tribe has met its burden under *Winter* [citation omitted], the district court should explain, on an individualized basis, why the evidence does or does not show a likelihood of dissipation"); *Tucson*, 91 F.4th at 1324 (explaining a

37

district court's decision is based on an erroneous legal standard, and thus is an abuse of discretion, if the court "misapprehended the law with respect to the underlying issues in the litigation").

EPA did not meet its burden on this element because it did not clearly show that state and local authorities are not effectively protecting the public. While EPA has discretion to determine whether the state and local authorities' actions are sufficient, H. R. Rep. 93-1185, *reprinted in* 1974 U.S.C.C.A.N. at 6487, here, there is nothing in the record—beyond counsel's *post-hoc* rationalizations—explaining how or why EPA determined that the state and local authorities' actions were insufficient. Counsel's arguments cannot be accepted in lieu of an actual determination from EPA itself. *Cf. W.R. Grace*, 261 F.3d at 338 (recognizing that in reviewing EPA's decision to issue an emergency order pursuant to § 300i(a), "we may not accept appellate counsel's *post hoc* rationalizations for agency action. Put another way, an agency's order must be upheld on the same basis articulated in the order *by the agency itself*." (second emphasis added)).

The only evidence EPA submitted with its opening brief[6] addressing the sufficiency of the state and local authorities' actions comes from the declaration of

---

[6] While EPA submitted additional declarations with its reply, none of these explained if, when, or why EPA determined that the state and local authorities' actions were insufficient. Moreover, if EPA intended to rely on this evidence, it was required to present it with its *opening* brief; it was improper to wait until reply. *See infra*, Part

38

Eric Winiecki, an EPA regional compliance officer, who stated, "the County's efforts will not address source control measures at the Dairies and do not include residents within one mile downgradient from Defendants' properties," and that state agencies "support EPA's continued exercise of its SDWA Section 1431 authority to enforce the Consent Order and address the imminent and substantial endangerment from the Dairies; they do not plan to duplicate EPA's efforts relating to the Dairies." 5-ER-1092–93; *see also* 5-ER-1166–67.

Mr. Winiecki did not even claim that EPA found the state and local authorities' drinking water or groundwater monitoring program ineffective at protecting the public. Instead, he paraphrased a vague letter from two state officials who indicated that state and local authorities had developed a successful program to address nitrate contamination in the Lower Yakima Valley, but that they planned to conserve state resources and not duplicate EPA's efforts in the area covered by the consent order. 5-ER-1162–63. His statement regarding source control measures is immaterial in the context of what EPA sought at the preliminary injunction stage— testing and provision of drinking water, groundwater monitoring, and a specific leak test for Cow Palace. *See* 5-ER-1170–84. Finally, Mr. Winiecki's assertion that the state and local authorities' "efforts" do not include the residents who live within one

---

VII.B.

mile downgradient is incorrect. 2-ER-126–27 (Mr. Larsen explaining how he and Anchor staff coordinate with the County and that the programs overlap).[7]

Here, the state and local authority GWMA partners *are* acting to protect the health and safety of residents in the Lower Yakima Valley, including in the entire area covered by the preliminary injunction. 2-ER-126–27; 2-ER-142–43; 2-ER-145–46. While the GWMA has, is, and will take numerous actions to address nitrate in the Valley, *see generally* 4-ER-703–78, the two ongoing activities that are most relevant to this appeal are the Safe Drinking Water Initiative and the Ambient Groundwater Monitoring Network.

***GWMA Safe Drinking Water Initiative.*** As described above, Yakima County, in partnership with the Washington State Department of Health and the Yakima Health District, offers free nitrate testing for private and shared drinking water wells in the Lower Yakima Valley GWMA. 5-ER-926–34. For wells that test above the MCL, the County notifies the resident (in English and Spanish) and will provide free bottled water and/or installation of an in-home treatment system (with a year of free maintenance). 5-ER-936–39. As Yakima County Commissioner

---

[7] Even if, for argument's sake, Mr. Winiecki was correct, that would *at most* support a conclusion that Mr. Winiecki found the state and local authorities' efforts are insufficient within 1-mile downgradient of the Dairies—meaning that their efforts 1 mile to 3.5 miles downgradient of the Dairies *are* sufficient and EPA cannot exercise its emergency power in that area.

LaDon Linde explained, this locally run Initiative is "an effective program through the Lower Yakima Valley Groundwater Management Area (GWMA) to provide outreach to residents and follow up to test drinking water and then provide treatment and bottled water." 4-ER-656.

The County has performed extensive outreach to publicize the Safe Drinking Water Initiative and reach as many people as possible. As of September 20, 2024, when the Dairies' submitted their opposition brief, the state and local authority GWMA partners involved in the Initiative had sent direct mailings to more than 2,000 properties, in addition to conducting outreach by mail, radio, TV, social media, calls, emails, and door-to-door. 5-ER-934; *see also* 4-ER-656. In addition, the County has publicized the Initiative on its website, and it is being written about in local newspapers. 5-ER-926–28; 5-ER-958–59. As of September 20, these efforts have resulted in more than 1,200 responses; the return of more than 550 nitrate test strips; and the completion of more than 380 certified lab results. 5-ER-934. One hundred seventy properties had signed up for bottled water delivery as of September 20, 2024; and as of August 30, 2024, the County had installed more than 40 reverse osmosis filter systems. 5-ER-934.

As Commissioner Linde explained, the state and local authorities are "already addressing [nitrate] with local people on the ground who are doing great work including weekends to make it happen." 4-ER-657.

41

*GWMA Groundwater Monitoring.* In addition to the Safe Drinking Water Initiative, the state and local authority GWMA partners are conducting extensive monitoring of ground and drinking water wells with the 170-well Ambient Groundwater Monitoring Network. 4-ER-817. The data from these wells is available to EPA, and the state and local authority GWMA partners intend to combine the data from the network with the well data the Dairies are collecting. 4-ER-777; 4-ER-787.

The state and local GWMA partners *are* acting to protect Valley residents. EPA cannot clearly show otherwise and its claim must therefore fail.

**b. EPA did not—and cannot—clearly show that there may be an imminent and substantial endangerment within 3.5 miles downgradient of the Dairies.**

The effective actions of the state and local authorities foreclose EPA's use of its emergency powers. But theirs are not the only actions protecting the public. Indeed, these state and local authorities' efforts amplify and add to the Dairies' own efforts to provide testing and safe drinking water and monitor groundwater. The efforts of the state and local authorities, combined with the Dairies' efforts under the consent order, voluntary groundwater monitoring, and consent decrees, negate any threat nitrate may pose.

While nitrate may be a contaminant, its presence in groundwater alone does not create an imminent and substantial endangerment. An "imminent" and "substantial" endangerment is one that "threaten[s] to occur immediately," and

42

excludes waste that no longer presents a danger. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 486 (1996) (internal quotation marks omitted) (alteration in original). Emergency power under the Act is not "to be used in cases where the risk of harm is remote in time, completely speculative in nature, or *de minimis* in degree." *W.R. Grace*, 261 F.3d at 339–40 (quoting H.R. Rep. No. 93-1185, *reprinted in* 1974 U.S.C.C.A.N. at 6488). Where—as here—remedial or preventative actions have been taken to address contamination, courts have concluded that those actions nullify a finding of imminent and substantial endangerment. For example, in *Leister v. Black & Decker (U.S.), Inc.*, the Fourth Circuit concluded that because installation of filtration systems reduced the level of organic compounds in treated well water to below detectable levels, plaintiffs failed to establish "an immediate serious threat of harm" on their property, even though hazardous substances were present on their property. 1997 WL 378046, at *1, *3; *see also Tilot Oil, LLC*, 907 F. Supp. 2d at 968 (holding groundwater contamination that was subject of ongoing remediation not an imminent and substantial endangerment).

Similarly, the Dairies (like the state and local authorities) are engaging in preventative actions to nullify any danger nitrate may pose to the public through well testing, provision of safe drinking water, and groundwater monitoring for nitrate. EPA did not show otherwise.

***Well Testing and Provision of Drinking Water.*** As discussed above, pursuant to the consent order and the consent decrees, the Dairies established and fund two drinking water programs that cover residents within 3 miles downgradient of the Dairies. These programs provide all residents within that area access to free nitrate testing and, if their water tests above the MCL, free bottled water or a reverse osmosis system and maintenance. 2-ER-75–89; 2-ER-116–17; *supra*, Part IV.B, D. In short, even if a resident's well has nitrate above the MCL, they have access to safe drinking water, negating any risk.

***Groundwater Monitoring.*** As discussed above, the Dairies already engage in extensive groundwater monitoring under both the consent decrees and voluntarily under the consent order. The only difference in the Dairies' voluntary groundwater monitoring program (compared to what was required before those provisions of the consent order expired), is that the Daries have excluded monitoring for other parameters that do not provide any useful information for tracking nitrate in groundwater. After eight years of consent order monitoring showing that certain forms of nitrate are totally insignificant, there is no need to track them. Similarly useless for determining nitrate trends are measurements of non-nitrogen parameters. Excluding this unhelpful information does not impede EPA's ability to track nitrate in groundwater, but reduces the Dairies' substantial monitoring costs. 2-ER-93–98; *see supra*, Part IV.B, F.

44

***Geographic scope of the injunction.*** EPA predicated its claims of imminent and substantial endangerment in the 3.5 miles downgradient of the Dairies on the modeling of its expert, Dr. Schnaar. But as the Dairies' expert Dr. Vlassopoulos demonstrates, rather than acknowledge that some of the data shows downward nitrate trends, Dr. Schnaar's opinions rely on inappropriately extrapolated data from an overly simplistic groundwater model. 5-ER-964–65; 5-ER-966–73. And, as explained above, the model itself is flawed because Dr. Schnaar used inaccurate assumptions regarding nitrate concentrations, groundwater velocity, and recharge. 5-ER-975–76; 5-ER-1006–08; *supra*, Part IV.G. These shortcomings resulted in Dr. Schnaar delineating an inaccurately long nitrate plume. 5-ER-964–65; 5-ER-973–76; 2-ER-121–22; 2-ER-128–35; 3-ER-495–99; 3-ER-610–11.

While Dr. Schnaar tried to rebut these contentions, *see generally* 2-ER-44–69, at best this battle of the experts demonstrates that there are significant factual disputes. Accordingly, EPA cannot have carried its burden to show that the facts *clearly* support a finding of imminent and substantial endangerment, or the issuance of a preliminary injunction.

EPA's 3.5-mile boundary is also legally flawed because it is impermissibly based on a range of nitrate levels between 1 mg/L and 10 mg/L. 5-ER-1087–89; 5-ER-964–65; 5-ER-976–78. But the MCL (and the MCLG) for nitrate is 10 mg/L—not less than 10 mg/L. 40 C.F.R. § 141.62(b)(7); 40 C.F.R. § 141.51(b). A standard

45

*below* the MCL and protective MCLG cannot be used to show an imminent and substantial endangerment. Nor can the MCL be changed via this litigation. Doing so would contradict the plain language of the Act. 42 U.S.C. § 300g-1(b)(1)(E); 42 U.S.C. § 300g-1(b)(9); *see also infra*, Part VII.4.i.

### c. EPA's inaction undercuts its assertion of an imminent and substantial endangerment.

For over a decade, the Dairies have been implementing the consent order and providing EPA with regular reports on their activities—including monthly progress reports, detailed annual reports, and quarterly groundwater monitoring reports, among others. 2-ER-109–15. The Dairies and EPA are in *frequent* contact; EPA has been well aware of everything that the Dairies have been doing.

Yet as described above, despite more than 10 years of working together, EPA said *nothing* before it filed this suit. It did not invoke the consent order's enforcement provisions, or its dispute resolution provision. 5-ER-1006–10. In fact, it *disregarded* the Dairies' request (first made in 2021—three years before this suit was filed) to engage in the dispute resolution process so that the Dairies and EPA could come to an agreement about ongoing groundwater monitoring. 4-ER-868–69. While the Dairies have continued to voluntarily monitor groundwater since the consent order requirement expired, 2-ER-96–99, after rejecting the Dairies' June 2022 request for dispute resolution, EPA stopped engaging with the Dairies' counsel regarding continued groundwater monitoring, 5-ER-916–18; 4-ER-685. And EPA has never

46

said a word to the Dairies about the supposed inadequacies of the drinking water program. 2-ER-85–86.

EPA's inaction in the years leading up to this case belies its claim that there is an imminent and substantial endangerment. If there truly were, EPA would have engaged with the Dairies and their counsel well before it filed suit. Instead, EPA remained silent—rejecting the expeditious and informal dispute resolution process, and never seeking to work with the Dairies on a revised drinking water program.

### ii. The district court erred in finding irreparable harm.

Much like its determination that EPA was likely to succeed on the merits of its claim, the district court's summary conclusion that residents are being affected by high levels of nitrate completely ignores the Dairies' and state and local authorities' remedial actions, i.e., the ongoing testing and provision of safe drinking water and robust groundwater monitoring. These efforts negate any risk of harm that the residents may face from nitrate. *See supra*, Parts IV.B–F, VII.3.a–b.

All residents in the 3.5-mile injunction area already have access to at least one, if not two, drinking water programs, be it the Dairies' consent order drinking water program, the Safe Drinking Water Project (funded by the Dairies), and/or the County's Safe Drinking Water Initiative. 2-ER-141–143; 3-ER-572.

While not all individuals are participating in one of these programs, it is not for lack of trying by the Dairies or state and local authorities. As noted above, state

47

and local authorities have engaged in substantial outreach efforts to get residents enrolled in the Safe Drinking Water Initiative. 5-ER-926–56; 5-ER-958–59; 4-ER-656–57. While this has resulted in over a thousand responses, hundreds of tests for nitrate, and the provision of bottled water and reverse osmosis filter to many residents, there have also been over 200 properties that have *opted out* of the program. 5-ER-934. Neither the County, the Dairies, nor EPA can compel individuals who do not want to participate to do so.

As discussed above, the Dairies' efforts have been similarly successful in reaching people within the 1-mile area served by the consent order drinking water program, as evidence by the 68% increase in enrollment in the program. 2-ER-79. The Dairies have tried to increase this enrollment even further, recently reaching back out to those residences that originally refused to participate in the program. 2-ER-84; 2-ER-199–201; *supra*, Part IV.B, D.

On top of this consent order program, pursuant to the consent decrees, the Dairies fund the Clean Drinking Water Project, which is supposed to cover well testing and provision of safe drinking water in an area 1-to-3 miles downgradient of the Dairies. *E.g.*, 2-ER-116–17; 5-ER-920–21. While the Dairies *fund* the Clean Drinking Water Project (at a cost of $2,000 per month, per Dairy, totaling more than $620,000 since the Dairies started funding it), under the terms of the consent decrees the Clean Drinking Water Project's activities are *not* within the Dairies' control. 2-

48

ER-118–20. The consent decrees mandate that the Project be "administered by a third party, in consultation with [the RCRA case plaintiff]." 4-ER-672–79; 4-ER-668; Case. No. 2:13-cv-03016-TOR (E.D. Wash.), ECF Nos. 396 ¶¶ 46–5. Placing the blame on the Dairies for a program they cannot control is nonsensical and a waste of resources.

That there is no need for another drinking water program, like the one established by the preliminary injunction, is demonstrated by EPA's *own* actions. In July 2024, after filing the Complaint, EPA conducted its own mailing and electronic outreach efforts to more than 500 households in the injunction area. 2-ER-86. As of September 30, 2024 (when the Dairies filed their opposition to the preliminary injunction), EPA had received and shared with the Dairies just *three* responses it received from this outreach. 2-ER-86–87; 2-ER-203–04 (EPA mailing). Yet all three have water already being effectively treated under the consent order drinking water program or below the MCL in the first place. 2-ER-86–87; 2-ER-156–97; 2-ER-206–13. The *lack* of response to EPA's additional outreach demonstrates that residents in the Lower Yakima Valley already have access to testing and safe drinking water. Adding another drinking water program will do more harm than good. *See infra*, Part VII.A.3.v.

There is similarly no need to require more groundwater monitoring to avoid irreparable harm to the community. The Court ignored the Dairies' ongoing

49

monitoring and apparently disregarded that the state and local authorities' monitoring efforts are "the largest long-term ambient groundwater network in Washington State." 4-ER-817–18. EPA has access to all this information. *See* 2-ER-89–99; 2-ER-109–10; 2-ER-116; 2-ER-120–22; 2-ER-127; *supra*, Part IV.C–D.

Given the existence of *three* drinking water programs and robust groundwater monitoring, EPA did not—and could not—clearly show that there was a risk of irreparable harm absent the preliminary injunction. The district court erred by apparently ignoring all this evidence and focusing only on the existence of nitrate in groundwater.

### iii. The district court erred in merging the balance-of-equities and public-interest factors.

Relying on *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), the district court merged its analysis of the last two *Winter* factors: the balance of equities and the public interest. 1-ER-6–7. The *Drakes Bay Oyster Co.* court did state, "[w]hen the government is a party, these last two factors merge," but in context it is clear the court meant when an injunction is sought *against the government* (as it was in that case), these two factors merge. 747 F.3d at 1077, 1092 (citing *Nken*, 556 U.S. at 435). The Supreme Court states this explicitly in *Nken*, upon which *Drakes Bay Oyster Co.* relied: "These [stay] factors [assessing harm to the opposing party and weighing the public interest] merge when the Government *is the opposing*

50

*party.*" *Nken*, 556 U.S. at 435 (emphasis added). And this Court has recognized the analysis merges where the government is the party *opposing* the injunction, even when it relies on *Drakes Bay Oyster Co*. *E.g.*, *Chamber of Comm. of the U.S. of Am. v. Bonta*, 62 F4th 473, 481 (9th Cir. 2023) ("when a party seeks a preliminary injunction *against the government*, as is the case here, the balance of equities and public interest factors merge" (emphasis added) (citing *Drakes Bay Oyster Co.*, 747 F.3 at 1092)); *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) ("Where, as here, *the government opposes a preliminary injunction*, the third and fourth factors merge into one inquiry." (emphasis added) (citing *Drakes Bay Oyster Co.*, 747 F.3 at 1092)).

But here, the government *sought* the injunction—it did not oppose it. Accordingly, the district court should have evaluated each *Winter* factor independently. Its failure to do so before granting the preliminary injunction was legal error necessitating reversal. *See Cottrell*, 632 F.3d at 1135 (explaining that showing must be made on *each* of the four *Winter* elements).

### iv. The district court failed to give serious consideration to the Dairies' equities.

The Dairies have spent more than 10 years and *millions* of dollars implementing the consent order and consent decrees. They are committed to reducing their contributions of nitrate in the groundwater, to monitor groundwater,

and to provide testing and safe water to residents affected by nitrate above the MCL. *See supra*, Parts IV.B, D–F, IV.A.3.i.b.

Despite these ongoing efforts, without warning and after years of silence, EPA filed this suit and moved for a preliminary injunction. In doing so, EPA sought to place the entire burden of nitrate contamination in the Valley on the Dairies. By granting the preliminary injunction, that is exactly what the district court did.

This was grossly inequitable. The Valley has high background nitrate levels to which the Dairies did not contribute. Indeed, the Dairies are already expending tremendous resources to address nitrate and protect Valley residents, but as the GWMA and EPA's own expert recognized, the Dairies are *not* the only source of nitrate in the Valley—there are numerous *other* nitrate contamination sources. 5-ER-1086 (Dr. Schnaar Opinion 1: "The Dairies are a source of nitrate to groundwater in the LYV *in addition to other sources that are present*" (formatting altered, emphasis added)); 4-ER-734; 2-ER-149–52. These other sources include four large dairies downgradient from the Dairies EPA sued here, and irrigated agriculture—which the GWMA identified as the majority source of nitrate in the Valley. 4-ER-734; 2-ER-149–52. Over 85% of the area south of the Dairies within the injunction area is used for irrigated, commercial agriculture. 2-ER-151. Another fact the district court apparently ignored is that Liberty Dairy is no longer even conducting dairy operations, which should weigh against placing the burden of the

preliminary injunction on it. 4-ER-669 (Liberty sold all of its cattle after this case was filed).

The Dairies presented this evidence and these arguments to the district court, *see* 5-ER-1069–72, but there is *no* indication that the district court considered them. 1-ER-6–7. The district court thus "made both an error of law and a clear error of fact by failing to give serious consideration to" the Dairies' equities. *Overstreet ex rel. N.L.R.B.*, 587 F. App'x at 381–82 (vacating preliminary injunction, explaining "[t]he district court made both an error of law and a clear error of fact by failing to give serious consideration to GRS's equities"). "Because the district court did not meaningfully evaluate" the Dairies equitable arguments, "the court failed to discharge its burden of fairly weighing the equities of both parties." *Id.* at 381.

Requiring these three Dairies to bear the entire cost of nitrate contamination in the Valley is fundamentally unfair, especially given all that the Dairies are already doing, and are willing to continue to do. *United States v. Price*, 688 F.2d 204, 214–15 (3d Cir. 1982) (affirming denial of preliminary injunction where it would bind only a few defendants, explaining "to require these few to bear the entire cost of the requested relief might prove impractical and unfair").

Similarly, the district court did not address how the equities tip in favor of conducting leak testing on Lagoon 1. As discussed above, the tears to Cow Palace's secondary liner and the leak in the primary liner were properly and timely addressed.

53

Cow Palace also presented evidence, including evidence from the *leak detection system* and that nitrate in the nearest downgradient monitoring well is *decreasing*, indicating a one-time release rather than an ongoing leak. *Supra*, Part IV.E. EPA's argument below relied on an increasing trend in nitrate, 5-ER-1165, essentially ignoring groundwater monitoring data from late 2022 to present. *See* 3-ER-579; 3-ER-602–03. It is wholly unfair and unnecessary to require Cow Palace to conduct expensive leak testing considering all of the evidence presented below.

The district court should have fairly weighed the equities; they tip in the Dairies' favor. But it did not, and this was an error of law and fact.

### v. The preliminary injunction undermines the public interest.

The district court erred in summarily concluding that the public interest would be served by granting the preliminary injunction. 1-ER-6–7. In fact, the new drinking water program required by the preliminary injunction *undermines* the state and local authorities' and Dairies' ongoing efforts. As County Commissioner Linde explained, EPA's efforts in this action are "only going to create duplication, confusion, and cover areas where [state and local authorities] are already effectively addressing safe drinking water in our community." 4-ER-657. The Board's media release issued after the Court issued the preliminary injunction echoed Commissioner Linde's concerns. *See supra*, Part IV.H.

54

The creation of *yet another* drinking water program will similarly undermine the work the Dairies are doing through the consent order drinking water program. Since taking over direct management of that program in 2019, Mr. Larsen has "personally made it a priority to maintain consistency with our staffing of the program in an effort to build and maintain trust with the residents we serve." 2-ER-83–84. "Based on feedback given to Anchor QEA, the growth of the existing Consent Order program has been in part due to the continuity of service." 2-ER-143–44. But the preliminary injunction requires the Dairies to retain new, independent, third-party organizations to coordinate with residents, which will likely "disrupt existing service relationships that have proven effective," and undermine the trust Anchor QEA has spent years building. 2-ER-143–44; *see* 1-ER-9–10. Moreover, the "extensive new testing and reporting obligations to EPA, none of which enhance the level of service provided to the program customers . . . will result in new inconveniences to program participants, who as we have seen are in many cases reluctant to allow testing or provision of alternative drinking water in their homes." 2-ER-143–44. In short, a new program is unnecessary and will hurt—rather than protect—the public interest. *See* 2-ER-141–44.

Requiring additional groundwater monitoring is also not needed to protect the public interest. As discussed above, the Dairies and state and local authorities already have a robust nitrate monitoring network. *Supra*, Part IV.B–D, VII.A.3.i.a–

55

b. Groundwater near the Dairies is some of the most heavily monitored in the Lower Yakima Valley. 2-ER-144–47. The additional parameters that the Dairies must monitor under the preliminary injunction are not relevant to monitoring nitrate in groundwater; they are not needed to protect the public interest. 2-ER-144–49.

### 4. The preliminary injunction is impermissibly overbroad.

The Court should not have granted the preliminary injunction in the first instance. EPA did not show that the law and facts "clearly" favored the issuance of an injunction. But even if, for argument's sake, the district court did not err in granting EPA's motion, the preliminary injunction must still be reversed for two reasons: First, its geographic scope is premised on a standard less than the enforceable MCL for nitrate. Second, it is overbroad.

### i. The district court erred as a matter of law in imposing an injunction 3.5 miles downgradient of the Dairies.

Without discussion, the Court accepted the 3.5 miles downgradient from the Dairies (the "Affected Area") that EPA proposed as the boundary in the preliminary injunction. 1-ER-8–16. As discussed above, this boundary is impermissibly based on nitrate levels below the health-protective MCL and the MCLG. *Supra*, Part IV.H, VII.A.3.i.b; 40 C.F.R. § 141.62(b)(7); 40 C.F.R. § 141.51(b).

By accepting EPA's boundary, the Court effectively changed the regulatory standards through this litigation. That was legal error and directly contrary to the plain language of the statute, which mandates that any change to the MCL and

56

MCLG be made through formal rulemaking. 42 U.S.C. § 300g-1(b)(1)(E); 42 U.S.C. § 300g-1(b)(9). No rulemaking occurred here. There is no legal basis for the Court to rely on a standard *below* the MCL—let alone the MCLG—to set the boundary of the preliminary injunction. The geographic scope of the preliminary injunction is legally flawed and must be reversed.

### ii. The preliminary injunction is not a narrowly-tailored gap filling measure.

"Injunctive relief . . . must be narrowly tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion." *Stormans, Inc.*, 586 F.3d at 1140 (omission in original) (internal citations omitted) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)); *see also Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). As with the order granting the injunction, the Court must explain its reasoning, making it clear *how* the injunction is narrowly tailored. *LA All. For Human Rts. v. County of Los Angeles*, 14 F.4th 947, 960–61 (9th Cir. 2021) (vacating mandatory preliminary injunction in part because the order failed to explain how the relief was tailored to plaintiffs' injury).

The district court failed to explain why or how the preliminary injunction was narrowly tailored to address the purported risk to the public. Without comment (beyond the scant conclusory statements in the opinion, discussed above), the district court simply adopted—apparently verbatim—the preliminary injunction that EPA

57

proposed. *Compare* 5-ER-1170–84 (EPA's proposed preliminary injunction), *with* 1-ER-8–20 (preliminary injunction).

The injunction is not a narrowly-tailored, gap-filling measure. Instead, it requires the development of *yet another* drinking water program—even though there are already three that cover the entire injunction area. The entirely new, overlapping program does not account for the existing programs, the outreach already conducted through those programs, or the residences that are already either enrolled in the existing programs or those that have opted out of those programs. Without explanation, the preliminary injunction also imposes extensive new testing and reporting obligations, none of which enhance the level of service, and which may actually *discourage* participation. 2-ER-141–44. The district court did not even mention Lagoon 1 or the evidence indicating that leak testing was wholly unnecessary.

Far from being narrowly tailored, the overbroad injunction creates yet another drinking water program, requires unnecessary additional groundwater monitoring, and mandates an unnecessary lagoon leak test for Cow Palace. Given the existing programs and monitoring, and the utter lack of explanation from the district court regarding the scope of the injunction, it is impossible to see how this preliminary injunction is narrowly tailored. It is not and the district court abused its discretion in entering it.

58

### B. The district court abused its discretion by denying the Dairies' motion to strike or in the alternative file a sur-reply.

Moving parties must raise all of their arguments in, and provide all the supporting evidence with, "their opening brief to prevent 'sandbagging' of the nonmoving party and to provide opposing counsel with the opportunity to respond." *Lewis*, 2009 WL 3698028, at *1 (quoting *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990)). It is therefore "'improper for a moving party to introduce new facts . . . in the reply brief than those presented in the moving papers' when those facts could have been presented in the opening brief." *Id.* (omission in original) (quoting *Jones v. Baltimore Life Ins. Co.*, 2007 WL 1713250, at *9 (E.D. Cal. June 12, 2007)).

In the Opposition brief and their 10 accompanying declarations, the Dairies pointed out significant holes in EPA's motion for preliminary injunction. On reply, EPA submitted *12 declarations*—4 times the number it submitted in support of the original motion—ambushing the Dairies with evidence that either (a) should have been submitted with its opening brief so that the Dairies had an opportunity to respond, or (b) was entirely unrelated to the three issues raised in EPA's motion. This went far beyond the limited evidence that may "accompany reply because they supported [the] reply brief, not [the] original motion." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (2d Cir. 2002) (citing *McGinnis v. Se. Anesthesia Associates, P.A.*, 161 F.R.D. 41, 42 and n.1 (W.D.N.C. 1995).

59

After receiving EPA's reply, the Dairies promptly moved to strike the improper portions of the reply brief and declarations and, in the alternative, asked for leave to file a sur-reply, providing detailed charts of the objectionable material and the basis for the Dairies' objections. 2-ER-40–43; 2-ER-32–36. Without any discussion of the motion—or any indication of whether it relied on the improper evidence—the district court summarily denied the Dairies' motion to strike or for sur-reply. 1-ER-8.

The district court abused its discretion in denying the Dairies' motion to strike or for a sur-reply. New information presented for the first time on reply is improper, and should be stricken or disregarded *unless* the Court gives the non-moving party an opportunity to respond. *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993) (striking evidence submitted on reply); *see Provenz*, 102 F.3d at 1483. The Court neither struck the evidence, clearly disregarded it, nor provided the Dairies with an opportunity to respond via sur-reply. This was an abuse of discretion.

## VIII.   CONCLUSION

The Dairies respectfully request that this Court reverse the district court's order granting the preliminary injunction and denying the Dairies' motion to strike or in the alternative to file a sur-reply, and vacate the preliminary injunction.

Date: January 21, 2025.

Respectfully submitted,

**FOSTER GARVEY PC**

*s/Devra R. Cohen*
Devra R. Cohen, WSBA #49952
Lori A. Terry, WSBA #22006

*Attorneys for Defendants/Appellants George & Margaret, L.L.C.; George DeRuyter and Son Dairy, L.L.C.; and D and J Dairy, L.L.C.*

**PERKINS COIE LLP**

*s/Meredith R. Weinberg*
Meredith R. Weinberg, WSBA No. 45713

*Attorneys for Defendants/Appellants Liberty Dairy, LLC, Liberty Acres LLC, Bosma Dairy Partners, LLC, Arizona Acres Limited Partnership, and Bosma Enterprises, Inc.*

**MARTEN LAW LLP**

*s/James A. Tupper, Jr.*
Jeff B. Kray, WSBA No. 22174
James A. Tupper, Jr., WSBA No. 16873
Bryce M. Brown, OSB No. 225511

*Attorneys for Defendants/Appellants Cow Palace, LLC, The Dolsen Companies, and Three D Properties, LLC*

61

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 21, 2025.

I hereby certify that on January 21, 2025, I mailed by United States Postal Service the document to the following non-CM/ECF participants:

Henry Bosma
4300 Beam Rd.
Zillah, WA 98953-9050

Henrietta Bosma
4300 Beam Rd.
Zillah, WA 98953-9050

Kathleen Nicolaus
12475 W. Meadow Wood Dr.
Boise, ID 83713-5853

Executed in Seattle, Washington on January 21, 2025.

*/s/ Gabriela DeGregorio*
Gabriela DeGregorio, Legal Practice Assistant
FOSTER GARVEY PC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
gabby.degregorio@foster.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 24-7749

The undersigned attorney or self-represented party states the following:

[x] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Signature s/Devra R. Cohen          Date: January 21, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  24-7749

I am the attorney or self-represented party.

**This brief contains**  13,752  **words,** including  4  words manually counted

in any visual images, and excluding the items exempted by FRAP 32(f). The brief's

type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/Devra R. Cohen  **Date**  January 21, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*